IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE:<br>OPTIM ENERGY, LLC, et al., | : | Bankr. Case No. 14-10262-BLS |
| WALNUT CREEK MINING COMPANY, | : | |
| Appellant, | : | |
| v. | : | Civ. No. 14-738-LPS |
| CASCADE INVESTMENT, LLC, et al., | : | |
| Appellees. | : | |

## MEMORANDUM

Pending before the Court is Appellant Walnut Creek Mining Company's appeal from the May 13, 2014 Opinion and Order ("Order") (D.I. 1-2, 1-3) of the United States Bankruptcy Court for the District of Delaware dismissing its Motion for Derivative Standing ("Standing Motion"). For the reasons discussed, the Court will affirm the Bankruptcy Court's Order.

## I.     BACKGROUND[1]

Cascade Investment, LLC (through its wholly-owned subsidiary ECJV) (collectively "Cascade" or "Appellee") and PNM Resources, Inc. ("PNMR") formed Debtor Optim Energy, LLC, in January 2007 for the purpose of entering the deregulated Texas electricity market. (D.I. 16 at 2) Cascade contributed cash, and PNMR contributed an existing power plant, resulting in equivalent ownership stakes between the two entities. (*Id.*) On February 12, 2014, Optim

---

[1] The Bankruptcy Court's opinion provides a more detailed factual background of this case. *See In re Optim Energy, LLC*, No. 14-10262 (BLS), 2014 WL 1924908, at *1 (Bankr. D. Del. May 13, 2014)

Energy, LLC and certain subsidiaries (collectively, "Debtor") filed for chapter 11 bankruptcy relief in the United States Bankruptcy Court for the District of Delaware. (Bankr. Case No. 14-10262, D.I. 1)

On June 1, 2007, Cascade and Debtor had entered into a financing arrangement with Wells Fargo. Wells Fargo agreed to extend Debtor an unsecured $1 billion revolving line of credit (the "Wells Fargo Credit Facility"). Cascade provided a joint guarantee of this debt (the "Cascade Guaranty") as a condition precedent to Wells Fargo's agreement to lend. (Bankr. Case No. 14-10262, D.I. 194, Ex. M at § 7.1(a)(3)(5)) In exchange for the Cascade Guaranty, Debtor similarly guaranteed that it would reimburse Cascade for any payments that Cascade made pursuant to the Cascade Guaranty (the "Reimbursement Guaranty"). (D.I. 14 at 2) Cascade secured the Reimbursement Guaranty with a first priority lien on substantially all of Debtor's assets, but subordinated this lien to the Wells Fargo Credit Facility. (*Id.*; Bankr. Case No. 14-10262, D.I. 194, Ex. M at § 7.1(a)(3)(5))

Debtor's bankruptcy filing constituted an event of default under the Wells Fargo Credit Facility. (D.I. 14 at 3) In accordance with the Cascade Guaranty, Cascade became liable for the approximately $712 million still outstanding under that debt facility. In preparation for Debtor's default, Cascade had wired this amount to an account at Wells Fargo Bank. (Bankr. Case No. 14-10262, D.I. 194, Ex. S) On the petition date, Wells Fargo set-off this deposit against Cascade's outstanding debt under the Wells Fargo Credit Facility, which then triggered Debtor's obligation to Cascade under the Reimbursement Guaranty. (*Id.*) Debtor's bankruptcy schedules list Cascade as a creditor holding a claim for approximately $712 million, secured by substantially all of its assets. (*Id.*, D.I. 206 at 18)

On March 6, 2014, the Bankruptcy Court granted the Final DIP Financing Order. (*Id.*, D.I. 144) This Order provided that any adversary proceedings challenging prepetition indebtedness must be brought by May 13, 2014 (the "Challenge Period"). (*Id.* at ¶ 14) Walnut Creek Mining Company, the largest unsecured creditor in the case, sought to challenge Cascade's asserted secured position. (D.I. 14 at 3) On April 14, 2014, Walnut Creek filed its Standing Motion with the intent of commencing an adversary proceeding against Cascade. (Bankr. Case No. 14-10262, D.I. 194) Attached as an exhibit to that motion was a proposed adversary complaint (the "Complaint") that sought to recharacterize or subordinate Cascade's purported debt. (*Id.* at Ex. A)

After briefing and oral argument, the Bankruptcy Court issued an Opinion (D.I. 1-2) and Order (D.I. 1-3) denying Walnut Creek's Standing Motion. The Bankruptcy Court found that no basis for derivative standing existed because Appellant's Complaint failed as a matter of law to state claims against Cascade. (D.I. 1-2 at 18)

On May 14, 2014,[2] Walnut Creek filed its notice of appeal in this Court. (D.I. 1) After the parties fully briefed the issues, the Court heard oral argument on February 10, 2015.

## II. PARTIES' CONTENTIONS

Appellant challenges the Bankruptcy Court's Order on the basis that it incorrectly found that the Complaint did not state claims for recharacterization and equitable subordination. (D.I. 12 at 5, 11) Appellant highlights several factual allegations in its Complaint that it claims the Bankruptcy Court did not properly consider. Appellant maintains that the Bankruptcy Court made factual findings, which was improper at this stage of the proceedings. Specifically, Appellant claims that the Bankruptcy Court should not have made factual findings with respect

---

[2] The parties stipulated to extend the Challenge Period by one day. (D.I. 14 at 3)

to (1) the adequacy of Debtor's capitalization on June 1, 2007; (2) Cascade's and Debtor's intention to treat the June 1, 2007 transaction as debt instead of equity; and (3) the equitableness of Cascade's conduct.[3] (*See* D.I. 1-2 at 14–15, 18) Appellant requests that this Court reverse the Bankruptcy Court's Order and grant retroactive relief permitting Appellant to file the proposed adversary proceeding notwithstanding the expired Challenge Period. Appellant offers three bases for such relief: (1) granting *nunc pro tunc* relief, (2) equitably tolling the deadline, or (3) excusing the late filing under Fed. R. Bankr. P. 9006(b)(1). (D.I. 14 at 14–18)

Cascade responds that the Bankruptcy Court considered and properly rejected all factual allegations in Cascade's Complaint. Moreover, Cascade maintains that even if Appellant has a basis for derivative standing, the expired Challenge Period forecloses it from filing an adversary proceeding that challenges pre-petition indebtedness. (D.I. 16 at 18)

## III. STANDARD OF REVIEW

Appeals from the Bankruptcy Court to this Court are governed by 28 U.S.C. § 158. Pursuant to § 158(a), district courts have mandatory jurisdiction to hear appeals "from final judgments, orders, and decrees" and discretionary jurisdiction over appeals "from other interlocutory orders and decrees." 28 U.S.C. § 158(a)(l) and (3). In conducting its review of the issues on appeal, this Court reviews the Bankruptcy Court's findings of fact for clear error and exercises plenary review over questions of law. *See Am. Flint Glass Workers Union v. Anchor Resolution Corp.*, 197 F.3d 76, 80 (3d Cir. 1999).

---

[3] Appellant's brief does not raise this argument, but rather reargues that it had sufficiently stated a claim for relief. (*See generally* D.I. 14) Normally, the Court will not consider an issue that a party raises for the first time at oral argument. *See Kost v. Kozakiewicz*, 1 F.3d 176, 182 (3d Cir. 1993). Regardless, for the same reasons set forth in this opinion addressing Appellant's other issues, the Court does not find any merit to this argument.

The Third Circuit has recognized a bankruptcy court's ability to confer derivative standing to a party that seeks to recover property of the estate on the debtor's behalf. *See Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548, 580 (3d Cir. 2003). Derivative standing requires a party to show three elements: "(1) a colorable claim, (2) that the trustee unjustifiably refused to pursue the claim, and (3) the permission of the bankruptcy court to initiate the action." *In re Yes! Entm't Corp.*, 316 B.R. 141, 145 (D. Del. 2004). The first element of that test—whether a party has asserted a colorable claim—requires "the court [to] undertake the same analysis as when a defendant moves to dismiss a complaint for failure to state a claim." *In re Centaur, LLC*, 2010 WL 4624910, at *4 (Bankr. D. Del. Nov. 5, 2010).

The Bankruptcy Court dismissed Appellant's Standing Motion on the basis that it did not articulate a colorable claim, as evaluated under the applicable Fed. R. Civ. P. 12(b)(6) standard. (D.I. 1-2 at 10, 19) Whether a party sufficiently states a claim is a question of law. *See Mayer v. Belichick*, 605 F.3d 223, 229 (3d Cir. 2010). Therefore, because this Court is reviewing a "purely legal question of whether dismissal for lack of standing was correct," it will exercise *de novo* review. *See In re Yes! Entm't Corp.*, 316 B.R. at 144. In deciding a motion to dismiss for failure to state a claim, the court is "required to accept as true all factual allegations in the complaint and draw all inferences from the facts alleged in the light most favorable to [the non-moving party]." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008). "'[S]tating . . . a claim requires a complaint with enough factual matter (taken as true) to suggest' the required element. This 'does not impose a probability requirement at the pleading stage,' but instead 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal

5

evidence of' the necessary element." *Id.* at 234 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. at 555–56 (2007)).

This inquiry calls for a two-step analysis. *See Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). "First, the factual and legal elements of a claim should be separated. The District Court must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions." *Id.* at 210–11. Second, the district court then "determine[s] whether the facts alleged in the complaint are sufficient to show that the plaintiff has a plausible claim for relief." *Id.* at 211.

## IV. DISCUSSION

Appellant limits its appeal to the Bankruptcy Court's findings that it did not assert a colorable claim for recharacterization or equitable subordination. (*See* D.I. 1-2 at 10)

### 1. Recharacterization

Evaluating an alleged recharacterization cause of action under a failure to state a claim standard is challenging because the precise contours of this cause of action are not entirely clear. While the Third Circuit has recognized that, with respect to this type of claim, courts "have adopted a variety of multi-factor tests . . . [which] undoubtedly include pertinent factors," it also announced that "[n]o mechanistic scorecard suffices" and the claim must be assessed on a "case-by-case basis." *In re SubMicron Sys. Corp.*, 432 F.3d 448, 455–56 (3d Cir. 2006). "[T]he focus of the recharacterization inquiry is whether a debt actually exists, or, put another way, . . . what is the proper characterization in the first instance of an investment." *Id.* (internal citations and quotation marks omitted). The Third Circuit ultimately explained that "the determinative inquiry in classifying advances as debt or equity is the intent of the parties as it existed at the time of the transaction." *Id.* at 457. "That intent may be inferred from what the parties say in their

contracts, from what they do through their actions, and from the economic reality of the surrounding circumstances." *Id.* at 456.

On appeal, Appellant argues that the Bankruptcy Court failed to accept three well-pleaded factual allegations in the Complaint that support a claim for recharacterization. (D.I. 14 at 6–10) First, Appellant maintains that the Debtor was inadequately capitalized at the time of the Cascade Investments; second, no prudent, bona fide lender would have guaranteed the Debtor's obligations under the Wells Fargo Credit Facility; and third, Cascade and PNMR made two capital contributions in 2010 and 2011 that they used to pay down the Wells Fargo Credit Facility, but these were nevertheless treated as equity. (D.I. 14 at 8–10)

First, Appellant's allegation that the Debtor was inadequately capitalized at the time of the June 1, 2007 transaction is insufficient, standing alone, to state a claim for recharacterization.[4] As the Third Circuit reasoned in *Submicron*, 432 F.3d at 457, the fact that a party lends to an inadequately capitalized company does not necessarily imply that it intends to infuse the company with capital; instead, it may have a pre-existing interest in the borrower that it is trying to protect. Even assuming Cascade did transact with the Debtor while it was inadequately capitalized on June 1, 2007, this allegation alone cannot establish a claim for recharacterization. *Id.* As explained below, there is not enough in the additional allegations to state a claim, even in combination with the allegation that the Debtor was inadequately capitalized at the time of the June 2007 transaction.

---

[4] Appellant contends that the Bankruptcy Court appeared to make a factual finding on this point, which would be improper as part of a Fed. R. Civ. P. 12(b)(6) analysis. However, even assuming the Bankruptcy Court did overstep, the Court is unconvinced that this provides grounds for a reversal, since even without any improper factual finding the Court concludes that Appellant cannot plausibly state a claim on which relief may be granted.

Appellant's second allegation -- that no prudent lender would have guaranteed the Debtor's obligations under the Wells Fargo Credit Facility -- has no impact on Cascade's and the Debtor's intent regarding the June 1, 2007 transaction at the time of that transaction. "[T]he determinative inquiry in classifying advances as debt or equity *is the intent of the parties as it existed at the time of the transaction*." *Submicron*, 432 F.3d at 457 (emphasis added). The Cascade Guaranty was required by Wells Fargo as a condition precedent to its agreement to extend the Credit Facility to the Debtor. (Bankr. Case No. 14-10262, D.I. 194, Ex. M at § 7.1(a)(3)(5)) Even assuming it was imprudent for Cascade to bind itself as a guarantor to the Debtor's Wells Fargo Credit Facility, this decision was the result of a transaction between Cascade and Wells Fargo. The fact that Wells Fargo imposed a condition upon Cascade does not weigh upon Cascade's intent with respect to entering into the separate Reimbursement Guaranty with Debtor.

Similarly, Appellant's third factual allegation has no bearing on a claim for recharacterization. Appellant argues that the "2010 and 2011 capital contributions made by the Cascade-Appellees for purposes of paying down the WFB Unsecured Credit Facility were treated as equity investments by the Appellees." (D.I. 14 at 10) Therefore, according to Appellant's reasoning, "the Cascade-Appellees waived their purported rights under the Reimbursement Agreement, as evidenced by these two transactions, and treated their debt as equity up until the Debtor[] filed for chapter 11 protection." (*Id.* at 10–11) But this factual allegation is irrelevant to Appellant's claim to recharacterize the debt that arose out of the June 1, 2007 transaction. How the Debtor and Cascade treated two transactions in 2010 and 2011 has no probative value as to their intent as of the time they entered into the Reimbursement Guaranty in 2007.

## 2. Equitable Subordination

The Third Circuit "has described equitable subordination as a 'remedial rather than penal' doctrine designed 'to undo or to offset any inequality in the claim position of a creditor that will produce injustice or unfairness to other creditors in terms of the bankruptcy results.'" *In re Winstar Commc'ns, Inc.*, 554 F.3d 382, 411 (3d Cir. 2009) (quoting *Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims*, 323 F.3d 228, 233 (3d Cir. 2003)). Equitable subordination is "grounded in a bankruptcy court's equitable authority to ensure that substance will not give way to form, that technical considerations will not prevent substantial justice from being done." *SubMicron*, 432 F.3d at 454 (citing *Pepper v. Litton*, 308 U.S. 295, 305 (1939)). It is "an extraordinary remedy which is applied sparingly." *In re Epic Capital Corp.*, 307 B.R. 767, 773 (D. Del. 2004).

This principle is codified in 11 U.S.C. § 510(c), which states:

> (c) Notwithstanding subsections (a) and (b) of this section, after notice and a hearing, the court may--
>
> (1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or
>
> (2) order that any lien securing such a subordinated claim be transferred to the estate.

11 U.S.C. § 510(c).

A party seeking equitable subordination must prove the following three elements: "(1) the claimant must have engaged in some type of inequitable conduct, (2) the misconduct must have resulted in injury to the creditors or conferred an unfair advantage on the claimant, and

9

(3) equitable subordination of the claim must not be inconsistent with the provisions of the bankruptcy code." *Citicorp Venture Capital*, 160 F.3d at 986–87.[5]

"Courts recognize three general categories of behavior that may constitute inequitable conduct: 1) fraud, illegality, or breach of fiduciary duties; 2) undercapitalization; and 3) claimant's use of the debtors as a mere instrumentality or alter ego." *In re Epic Capital Corp.*, 290 B.R. 514, 524 (Bankr. D. Del. 2003), *aff'd*, 307 B.R. 767 (D. Del. 2004). The Bankruptcy Court found that Appellant's Complaint did not adequately state a claim for inequitable conduct, as analyzed under a Fed. R. Civ. P. 12(b)(6) standard, and consequently did not need to consider the second and third elements of the test. (D.I. 1-2 at 19) The Bankruptcy Court explained its reasoning as follows:

> It is merely alleged that Cascade and ECJV performed under their guarantees on the Wells Fargo Credit Facility, guarantees that had been in existence for almost seven years. When Optim Energy filed its bankruptcy petition on February 12, 2014, the filing constituted an event of default under the Wells Fargo Credit Facility. There is no dispute that Cascade and ECJV as guarantors were obliged upon such an event of default to pay the outstanding balance under the Wells Fargo Credit Facility. There is also no dispute that at such time the outstanding aggregate principal amount of debts was approximately $712 million, which amount Cascade paid to Wells Fargo on the Petition Date. The Court has already determined *supra* that there is no viable claim for undercapitalization in 2007 at the time the Cascade Guarantees and Guaranty Reimbursement Agreement were signed, and there was no alter ego allegations. Therefore, under the more stringent standards applied to insiders, the facts alleged do not rise to the level of wrongful conduct.

---

[5] The parties dispute (D.I. 14 at 12; D.I. 16 at 12) whether the Third Circuit has formally adopted "inequitable conduct" as a required element of the test. *See Burden v. United States*, 917 F.2d 115, 120 (3d Cir. 1990). The Court finds that the Third Circuit has adopted this requirement. *See In re Winstar Commc'ns, Inc.*, 554 F.3d at 411; *see also In re Moll Indus., Inc.*, 454 B.R. 574, 585 (Bankr. D. Del. 2011) (recognizing *Winstar's* formal adoption of "inequitable conduct" element).

(D.I. 1-2 at 18–19) (internal footnotes omitted)

Appellant argues that the Bankruptcy Court erred in failing to recognize that Appellant had adequately stated a claim for equitable subordination. (D.I. 14 at 11) On appeal, Appellant's allegation of inequitable conduct includes that

> Cascade-Appellees strategically designed the Cascade Investments so that their own investments would be secured and senior to trade creditors conducting business with Optim as an operating company. *See* D.I. 194, Ex. A at ¶ 2. The structure of the Cascade Investment appears to have been intended to protect the Cascade-Appellee's equity investment at the expense of third-party, non-insider unsecured creditors. Tellingly, the Cascade-Appellees agreed to subordinate themselves to WFB's unsecured indebtedness, so the only purpose of the security interests was to put the owner ahead of other bona fide creditors of the business.

(D.I. 14 at 13) The Court finds that the Bankruptcy Court correctly determined that Appellant failed to allege grounds for equitable subordination.

"[C]ourts have recognized that obtaining a lien for the purpose of gaining an advantage over other creditors may be inequitable, depending on the circumstances surrounding that act." *United States v. State St. Bank and Trust Co.*, 520 B.R. 29, 84 (Bankr. D. Del. 2014) (citing cases). "Underhanded behavior is typically clearest . . . when 'corporate insiders [have attempted] to convert their equity interests into secured debt in anticipation of bankruptcy.'" *In re Sentinel Mgmt. Grp., Inc.*, 728 F.3d 660, 669 (7th Cir. 2013). This principle can likewise apply to a pre-petition unsecured creditor converting its debt from unsecured to secured status in order to leap-frog over another creditor in anticipation of bankruptcy. *State St. Bank*, 520 B.R. at 84; *see also Matter of Fabricators, Inc.*, 926 F.2d 1458, 1467–68 (5th Cir. 1991) (finding inequitable conduct when insider obtained liens as "one step interconnected with a series of actions by [the insider] to gain an advantage over the position of other creditors").

Nevertheless, Appellant's allegations, even if accepted as true, do not sufficiently plead inequitable conduct. "[O]btaining a security interest—without more—is not inequitable conduct." *See State St. Bank*, 520 B.R. at 84. The party must have engaged in some parallel behavior that demonstrates that it unfairly obtained the security interest. *See id.* Accordingly, a Bankruptcy Court in this District found inequitable conduct when an insider-noteholder implemented a plan in conjunction with a debtor's management to convert its pre-existing debt to secured status and obtain priority over an anticipated obligation to the IRS. *See id.* at 82. Another court found abundant evidence of inequitable conduct when insider-shareholders of the debtor, with knowledge of the debtor's undercapitalization, used the debtor to repay themselves first, and then extended additional credit on a secured basis to exchange its equity interest. *See In re Le Cafe Creme, Ltd.*, 244 B.R. 221, 236 (Bankr. S.D.N.Y. 2000). Similarly, the Court of Appeals for the Fifth Circuit affirmed the Bankruptcy Court's finding of equitable subordination when an acquiring company had made secured loans to the debtor-target company while it was undercapitalized, in a series of interconnected steps designed to acquire the assets of the troubled company. *See Fabricators, Inc.*, 926 F.2d at 1468.

By contrast, Appellant essentially argues that the inequitableness of the June 1, 2007 transaction was that Cascade designed the transaction to prioritize its interest "senior to trade creditors" and "ahead of other bona fide creditors of the business." (D.I. 14 at 13) This merely describes the mechanics of secured versus unsecured lending. It is not inequitable for a lender, even an insider lender, to obtain a lien on the borrower's assets in order to secure its position above other creditors in the event of the borrower's default. *See State St. Bank*, 520 B.R. at 84. Attaining a higher priority of repayment is a major motivation behind secured lending. Further,

there is no dispute that Cascade actually bound itself as a guarantor to the Wells Fargo Credit Facility, and -- upon the Debtor's default -- actually paid the amount outstanding on that debt.

"To qualify as inequitable conduct, the insider or fiduciary creditor must have actually used its power to control the debtor or its position of trust with the debtor to its own advantage or to the other creditors' detriment." *In re Mid-Am. Waste Sys., Inc.*, 284 B.R. 53, 70 (Bankr. D. Del. 2002). To this end, Appellant offers the conclusory statement that "the Cascade-Appellees manipulated their insider position to put themselves ahead of the Debtors' unsecured creditors . . . ." (D.I. 14 at 13) However, simply because the Debtor's obligation to Cascade was secured, and thus in a better position than that of the unsecured creditors, does not mean Cascade achieved this legitimate position through illegitimate means. Appellant does not allege facts that demonstrate Cascade controlled the Debtor or used it as an alter ego. It does not allege facts that suggest Cascade forced the Debtor to enter into either the Reimbursement Guaranty or the security agreement. It has only argued that Cascade obtained a superior position as a result of the June 1, 2007 transaction. By itself, this does not constitute inequitable conduct. *See Citicorp Venture Capital*, 323 F.3d at 235 ("[T]he pursuit of one's legal rights may not be grounds for equitable subordination . . . .").

The Court agrees that the Bankruptcy Court correctly found that Appellant did not sufficiently state a claim for relief for equitable subordination.

## V. CONCLUSION

The Court finds that the Bankruptcy Court did not err by dismissing Appellant's Standing Motion. Accordingly, and for the foregoing reasons, the Bankruptcy Court's Order will be affirmed. An appropriate Order follows.

March 13, 2015
Wilmington, Delaware

UNITED STATES DISTRICT COURT

13